Jesse Colorado Swanhuyser (SBN 282186)
ANACAPA LAW GROUP, INC
508 East Haley Street
Santa Barbara, CA 93103
Tel: (805) 689-1469
Email: jswanhuyser@alg.law

Arthur Pugsley (SBN 252200)
Melissa Kelly (SBN 300817)
LOS ANGELES WATERKEEPER
120 Broadway, Suite 105
Santa Monica, CA 90401
Tel: (310) 394-6162
Fax: (310) 394-6178
Email: arthur@lawaterkeeper.org
Email: melissa@lawaterkeeper.org

Attorneys for Plaintiff
LOS ANGELES WATERKEEPER

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOS ANGELES WATERKEEPER, a non-profit corporation,<br><br>Plaintiff,<br><br>vs.<br><br>GASSER OLDS COMPANY, INC., a corporation, DOES 1 through 10,<br><br>Defendants. | Case No. _____<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to 1387) |

LOS ANGELES WATERKEEPER ("WATERKEEPER" or "Plaintiff"), a

California non-profit corporation, by and through its counsel, hereby alleges:

COMPLAINT

1

# I.    **JURISDICTION, VENUE AND REMEDIES**

1.      This complaint seeks relief for ongoing violations by GASSER OLDS COMPANY, INC., a California Corporation ("Defendant" or "GASSER"), and DOES 1 through 10 of both substantive and procedural requirements of the Federal Water Pollution Control Act, 33 U.S.C. § 1251, *et seq.* (the "Clean Water Act" or "Act") and the National Pollutant Discharge Elimination System ("NPDES") Permit No. CA S000001, State Water Resources Control Board ("State Board") Water Quality Order No. 91-13-DWQ, as amended by Water Quality Order No. 92-12-DWQ, Water Quality Order No. 97-03-DWQ and Order No. 2014-0057-DWQ (collectively referred to as "Permit" or "General Permit"), resulting from polluted stormwater and non-stormwater discharges from the industrial facility owned and operated by GASSER at 2618 Fruitland Avenue ("Facility") in Vernon, California.

2.      This Court has subject matter jurisdiction over the parties and the subject matter of this action pursuant to Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A), and 28 U.S.C. § 1331 (an action arising under the laws of the United States).

3.      The relief requested is authorized pursuant to 28 U.S.C. §§ 2201–02 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration); 33 U.S.C. §§ 1319(b), 1365(a) (injunctive relief and civil penalties); and 33 U.S.C. §§ 1319(d).

4.      Venue is proper in the Central District of California pursuant to Section

505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial district.

5.     On April 13, 2018, Plaintiff provided notice of Defendant's violations of the Act, and of its intention to file suit against Defendant, to the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region IX; the Executive Director of the State Water Resources Control Board ("State Board"); the Executive Officer of the California Regional Water Quality Control Board, Los Angeles Region ("Regional Board"); and to Defendant, as required by the Act, 33 U.S.C. § 1365(b)(1)(A).  A true and correct copy of the notice letter is attached as EXHIBIT A, and is incorporated by reference.

6.     More than sixty (60) days have passed since notice was served on GASSER and the State and Federal agencies.  Plaintiff is informed and believes, and thereupon alleges, that neither the EPA nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint.

7.     This action's claim for civil penalties is not barred by any prior administrative penalty under Section 309(g) of the Act, 33 U.S.C. § 1319(g).

## II.   INTRODUCTION

8.     This complaint seeks relief for unlawful discharges of polluted storm water and non-storm water from the GASSER owned/operated Facility in violation of the Act and Permit.  Defendant's failure to comply with the discharge prohibitions,

COMPLAINT

technology and water quality based standards, planning and monitoring requirements, and other procedural and substantive requirements of the Permit and the Act are ongoing and continuous.

9.    With every significant rainfall event millions of gallons of polluted storm water originating from industrial operations, such as those conducted by Defendant, pour into storm drains and local waterways. The consensus among agencies and water quality specialists is that storm water pollution accounts for more than half of the total pollution entering surface waters each year.

10.    Los Angeles' waterways are ecologically sensitive areas and are essential habitat for dozens of fish and bird species as well as macro-invertebrate and invertebrate species. The waterways provide aesthetic opportunities, such as wildlife observation, and the public uses these waterways for activities such as water contact sports and non-contact recreation.

11.    Industrial facilities, like Defendant's, that discharge storm water and non-storm water contaminated with sediment, heavy metals, and other pollutants contribute to the impairment of downstream waters and aquatic dependent wildlife, expose people to such toxins, and harm the special aesthetic and recreational significance Los Angeles' waterways have for people in the surrounding communities.

### III.    PARTIES

12.    Plaintiff is a non-profit public benefit corporation organized under the

laws of the State of California with its main office located at 120 Broadway, Santa Monica, California 90401. WATERKEEPER is an organization of the Waterkeeper Alliance, the world's fastest growing environmental movement.

13.    Founded in 1993, WATERKEEPER is dedicated to the preservation, protection and defense of the inland and coastal surface and groundwaters of Los Angeles County. The organization works to achieve this goal through education, litigation and regulatory programs that ensure water quality protection for all waterways in Los Angeles County. Where necessary to achieve its objectives, WATERKEEPER undertakes enforcement actions under the Act on behalf of itself and its members.

14.    LAW has approximately 3,000 members who live and/or recreate in and around the Los Angeles basin, including many who live and recreate along the Los Angeles River and connected waters. WATERKEEPER members use and enjoy local waters and waterways to fish, surf, swim, sail, SCUBA dive, kayak, bird watch, view wildlife, hike, bike, walk, and run. Additionally, WATERKEEPER members use the waters to engage in scientific study through pollution and habitat monitoring and restoration activities.

15.    The unlawful discharge of pollutants from the Facility into the Los Angeles River and downstream water bodies impairs the ability of WATERKEEPER members to use and enjoy these waters. Thus, the interests of WATERKEEPER and its members have been, are being, and will continue to be adversely affected by the

COMPLAINT

5

Facility's failure to comply with the Act and Permit.  The relief sought herein will redress the harms to Plaintiff caused by Defendant's activities.

16.     Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff and its members, for which harm they have no plain, speedy or adequate remedy at law.

17.     Plaintiff alleges on information and belief that GASSER is a California corporation that owns and operates the Facility in Vernon, California.

18.     Upon information and belief, and upon that basis, Plaintiff alleges that the true names, or capacities of DOES 1 through 10, inclusive (the "DOES"), whether individual, corporate, associate or otherwise, are presently unknown to WATERKEEPER, who therefore sue said Defendants by such fictitious names. Plaintiff will amend this Complaint to show their true names and capacities when the same have been ascertained.  Whether or not GASSER is associated with any other individual, corporate, associate or otherwise was not immediately apparent through an initial investigation completed by WATERKEEPER.

19.     GASSER and DOES 1 through 10 are referred to collectively throughout this Complaint as Defendant or Defendants.

## IV.    LEGAL BACKGROUND

### A.    The Clean Water Act.

20.     Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States unless the discharge

complies with various enumerated sections of the Act. Among other things, section 301(a) prohibits discharges not authorized by, or in violation of, the terms of a NPDES permit issued pursuant to section 402 of the CWA, 33 U.S.C. §§ 1311(a) and 1342(b).

21.    The Act requires all point source discharges of pollutants to waters of the United States be regulated by an NPDES permit. 33 U.S.C. § 1311(a); *see* 40 C.F.R. § 122.26(c)(1).

22.    Section 402(p) of the Act establishes a framework for regulating industrial storm water discharges under the NPDES permit program. 33 U.S.C. § 1342(p).

23.    Section 402(b) of the Act allows each state to administer an EPA-approved NPDES permit program for regulating the discharge of pollutants, including discharges of polluted storm water.  *See* 33 U.S.C. § 1342(b).

24.    States with approved NPDES permit programs are authorized by Section 402(b) to regulate industrial storm water discharges through the issuance of a statewide general NPDES permit applicable to all industrial dischargers and/or through individual NPDES permits issued to dischargers.  *See* 33 U.S.C. § 1342(b).

25.    In California, the relevant NPDES permit is the Permit, which is issued by the State Board and implemented by the Regional Board for the region in question. *See* 33 U.S.C. § 1311(a), 1342, 1362(6), (7), (12).

26.    "Waters of the United States" are defined as "navigable waters," and "all

waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including waters which are subject to the ebb and flow of the tide." 33 U.S.C. § 1362(7); 40 C.F.R. § 122.2.

27.    The EPA promulgated regulations defining "waters of the United States." *See* 40 C.F.R. § 122.2. The EPA interprets waters of the United States to include not only traditionally navigable waters, but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and intermittent streams that could affect interstate commerce.

28.    Section 505(a)(1) of the Act provides for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation…or an order issued by the Administrator or a State with respect to such a standard or limitation."  *See* 33 U.S.C. §§ 1365(a)(1) and 1365(f).

29.    GASSER is a "person" within the meaning of section 502(5) of the Act. *See* 33 U.S.C. § 1362(5).

30.    "Effluent standard or limitation" is defined to include: (a) the prohibition in section 301(a) against unpermitted discharges; or (b) a condition of an NPDES permit such as the General Permit. *See* 33 U.S.C. § 1365(f).

31.    Each separate violation of the Act subjects the violator to a penalty of up to $51,570 per day for violations occurring after November 2, 2015; and up to $37,500 per day per violation for violations occurring prior to and including November 2, 2015.  *See* 33. U.S.C. §§ 1319(d) and 1365(a); 40 C.F.R. § 19.4

COMPLAINT

8

(Adjustment of Civil Monetary Penalties for Inflation).

32.     Section 505(d) of the Act allows prevailing or substantially prevailing parties to recover litigation costs, including fees for attorneys, experts, and consultants.  *See* 33 U.S.C. § 1365(d).  The court, in issuing any final order in any action brought pursuant to this section, may award costs of litigation to any prevailing or substantially prevailing party, whenever the court determines such award is appropriate.  *Id*.

**B.     California's Stormwater Permit.**

33.     The State Board is charged with regulating pollutants to protect California's water resources.  *See* Cal. Water Code § 13001.

34.     California is a state authorized by EPA to issue NPDES permits.

35.     Between 1997 and June 30, 2015, the Permit in effect in California was Order No. 97-03-DWQ, which WATERKEEPER refers to herein as the "1997 Permit."

36.     On July 1, 2015, California re-issued the Permit pursuant to Order No. 2014-0057-DWQ's NPDES, which is referred to herein as the "2015 Permit."

37.     The 2015 Permit superseded the 1997 Permit, except for enforcement purposes, and its terms are as stringent, or more so, than the terms of the 1997 Permit.  *See* 2015 Permit, Findings, ¶ 6.

38.     Prior to beginning industrial operations, dischargers are required to apply for coverage under (a.k.a. "enroll" in) the Permit by submitting a Notice of Intent to

COMPLAINT

9

Comply with the Terms of the General Permit to Discharge Storm Water Associated With Industrial Activities ("NOI") to the appropriate Regional Board. 1997 Permit, Finding #3; 2015 Permit, Findings, ¶ 17.

39.     In order to lawfully discharge polluted storm water in California, industrial dischargers must secure coverage under the Permit and comply with its terms; or obtain and comply with an individual NPDES permit.  1997 Permit, Finding #2; 2015 Permit, Findings, ¶ 12.

40.     Compliance with the Permit constitutes compliance with the Act for purposes of storm water discharges.  33. U.S.C. §§ 1311(b)(2)(A), 1311(b)(2)(E). Conversely, violations of the General Permit are violations of the Act. 1997 Permit, Section C(1); 2015 Permit, Section XXI(A).

41.     In order to encapsulate an entire winter in each Permit reporting period, a reporting year runs between July 1 and June 30 ("Reporting Year").

**C.     The Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations**

42.     The Permit contains a Discharge Prohibition on direct and indirect discharges of materials other than storm water ("non-storm water discharges") that are not otherwise authorized by an NPDES permit to waters of the United States. 1997 Permit, Section A(1); 2015 Permit, Section III(B).

43.     The Permit contains a Discharge Prohibition on storm water discharges and authorized non-storm water discharges that contain pollutants that cause or

threaten to cause pollution, contamination, or nuisance as defined in section 13050 of California Water Code.  1997 Permit, Section A(2); 2015 Permit, Section III(C).

44.     The Permit contains an Effluent Limitation that requires permittee facilities to reduce or prevent pollutants in storm water discharges through the implementation of Best Available Technology Economically Achievable ("BAT") for toxic or non-conventional pollutants, and Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.  40 C.F.R. §§ 401.15-16; 1997 Permit, Section B(3); 2015 Permit, Section V(A).

45.     Compliance with this Effluent Limitation requires permittee facilities to implement effective, site-specific structural and non-structural pollution control strategies called Best Management Practices ("BMPs") that are designed to prevent or reduce storm water discharges *consistent with* BAT and/or BCT.

46.     BAT and BCT consistent BMPs can include structural (e.g. installation of curbs to direct storm water flows, or filters to reduce pollutant concentrations), non-structural (e.g. sweeping/washing surfaces exposed to pollutants, or equipment inspections), or a combination of structural and non-structural measures.

47.     § 304(a)(4) of the Act identified "conventional pollutants" to include Total Suspended Solids ("TSS"), Oil and Grease ("O&G) and pH.  *See* 40 C.F.R. 401.16.  As discussed in more detail below, every permittee must design BMPs for all sources of TSS, O&G and pH that meet the BCT standard; and thereafter implement, maintain and revise/adapt such BMPs so as to ensure the concentration of TSS, O&G

and pH in any storm water discharge is reduced or prevented consistent with the BCT standard.

48.    Lead and copper are pollutants identified on the list of toxic pollutants designated pursuant to the Act's section 307(a)(1) at 40 C.F.R. 401.15.  As discussed in more detail below, this designation requires GASSER to design BMPs for all sources of lead and copper (or lead and copper containing inputs or wastes) that meet the more stringent BAT standard; and thereafter implement, maintain and revise/adapt such BMPs so as to ensure the concentration of these toxic pollutants in any storm water discharge is reduced or prevented *consistent with* the BAT standard.

49.    EPA's NPDES Storm Water Multi-Sector General Permit for Industrial Activities ("MSGP") includes numeric benchmarks for pollutant concentrations in storm water discharges ("Benchmarks").  EPA Benchmarks are numeric, concentration-based thresholds.

50.    EPA's Benchmarks serve as objective measures for evaluating whether the BMPs designed and implemented at a facility achieve the statutory BAT/BCT standards.  *See* MSGP, 80 Fed. Reg. 34,403, 34,405 (June 16, 2015); *see also* MSGP, 73 Fed. Reg. 56,572, 56,574 (Sept. 29, 2008); *see also* MSGP, 65 Fed. Reg. 64,746, 64,766-67 (Oct. 30, 2000).

51.    Discharges from an industrial facility containing pollutant concentrations that exceed EPA Benchmarks indicate that the facility has not developed and/or implemented BMPs that meet BAT for toxic pollutants and/or BCT for conventional

1    pollutants. *Id*.

2        52.    The persistent discharge of stormwater containing pollutant

3    concentrations that exceed the Benchmarks provides *prima facie* evidence that a

4

5    facility has failed to consistently and sincerely engage in *at least* one of the four

6    essential compliance strategies—i) planning and design; ii) on the ground BMP

7

8    implementation; iii) monitoring; or iv) BMP revision and addition. *See* United States

9    Environmental Protection Agency NPDES Multi-Sector General Permit for Storm

10   Water Discharges Associated with Industrial Activity, as modified effective May 9,

11

12   2009.

13       53.    The State Board established Numeric Action Levels ("NALs") in the

14
15   2015 Permit.  *See* 2015 Permit, Section V(A).

16       54.    NALs in the 2015 Permit serve as triggers for the remedial reporting

17   requirements called Exceedance Response Action evaluations and reports.  NALs are
18

19   not a means to determining compliance with the effluent or receiving water

20   limitations.  *See* 2015 Permit Fact Sheet, Section II at pp. 15-21.

21
22       55.    NALs are not intended to serve as technology-based or water quality-

23   based numeric effluent limitations. The NALs are not derived directly from either

24
25   BAT/BCT requirements or receiving water objectives. NAL exceedances defined in

26   this General Permit are not, in and of themselves, violations of this General Permit.

27   2015 Permit, Finding 63 at p. 11.

28
         56.    The Permit contains certain Receiving Water Limitations.  1997 Permit,

COMPLAINT
                                          13

Receiving Water Limitation C(1)-(2); 2015 Permit, Section VI(A).

57.    Receiving Waters are those surface or other waters to which pollutants are discharged from a given facility.

58.    The first Receiving Water Limitation is that discharges shall not cause or contribute to an exceedance of any applicable water quality standard ("WQS"). *Id.*

59.    WQSs are numeric limits and narrative standards established by the State Board, the various regional boards, and the EPA to protect a Receiving Water's beneficial uses.

60.    The State of California regulates water quality through the State Board and the nine Regional Boards. Each Regional Board maintains a separate Water Quality Control Plan that contains WQSs for water bodies within its geographical area.

61.    WQS applicable to the discharges applicable to the Facility include, but are not limited to, those set out in the *Water Quality Control Plan – Los Angeles Region: Basin Plan for the Coastal Watersheds of Los Angeles and Ventura Counties*[1], California Regional Water Quality Control Board, Los Angeles Region 4 (adopted June 13, 1994, as amended) ("Basin Plan") and in the Criteria for Priority Toxic Pollutants for the State of California, a.k.a. California Toxics Rule ("CTR"). 65 Fed. Reg. 31712 (May 18, 2000); 40 C.F.R. § 131.38.

---

[1] *Available at* http://www.waterboards.ca.gov/losangeles/water_issues/programs/basin_plan/.

62.    The Basin Plan identifies the "Beneficial Uses" of the portions of the Los Angeles River Watershed that receive polluted storm water discharges from the Facility.  These Beneficial Uses include: water contact recreation ("REC 1"), non-contact water recreation ("REC 2"), warm freshwater habitat ("WARM"), ground water recharge ("GWR"), wildlife habitat ("WILD"), wetland ("WET"), estuarine habitat ("EST"), industrial service supply ("IND"), navigation ("NAV"), marine habitat ("MAR"), commercial fishing ("COMM"), rare, threatened, or endangered ("RARE"), migration of aquatic organisms ("MIGR"), and spawning, reproduction and/or early development ("SPWN").  *See* Basin Plan, Table 2-1.

63.    Surface waters that cannot support the Beneficial Uses of those waters listed in the Basin Plans due to the presence of one or more pollutants are designated as impaired water bodies pursuant to Section 303(d) of the Clean Water Act, 33 U.S.C. § 1313(d).

64.    According to the 2012 303(d) List of Impaired Water Bodies, Reaches 1 and 2 of the Los Angeles River are impaired by pollutants such as pH, cyanide, diazinon, lead, nutrients, ammonia, cadmium, coliform bacteria, copper, trash, zinc, and oil.  The Los Angeles River Estuary is impaired by, among other pollutants, chlordane, sediment toxicity, and trash.  The Los Angeles/Long Beach Harbor is impaired by at least chrysene, copper, sediment toxicity, mercury, and zinc.  The San Pedro Bay is impaired by sediment toxicity, and the Long Beach City Beach, one of the San Pedro Bay beaches, is impaired by indicator bacteria.

65.     The Basin Plan includes narrative WQSs for inland surface waters and enclosed bays and estuaries for, among other things: chemical constituents, toxic substances, pH, oil & grease, suspended or settleable matter, and floating materials.

66.     EPA promulgated the CTR based on a determination that the numeric criteria were necessary to protect human health and the environment.

67.     The CTR "criteria apply throughout the water body including at the point of discharge into the water body."  65 Fed. Reg. 31712 paragraph (c)(2)(i).

68.     The Permit's second Receiving Water Limitation is that storm water discharges shall not adversely impact human health or the environment. 1997 Permit, Receiving Water Limitation C(1); 2015 Permit, Section VI(B).

69.     The third Receiving Water Limitation is that concentrations of pollutants in storm water discharges shall not threaten to cause pollution or a public nuisance. *See* 2015 Permit, Section VI(C).

70.     Thus, discharges with pollutant levels in excess of the CTR criteria, the Basin Plan standards, and/or other applicable WQSs are violations of Receiving Water Limitation C(2) of the 1997 Permit VI(A) of the 2015 Permit.

71.     U.S. EPA has established Total Daily Maximum Concentration ("TMDL") applicable to the Los Angeles River, which was subsequently incorporated into the Basin Plan via amendment by Resolution No. R13-004.

72.     The regulatory mechanism used to implement the TMDL wasteload allocations assigned to point sources, including the Facility, is the General Permit.

73.     The Receiving Waters are an important community resource.  Although pollution and habitat destruction have drastically altered the natural ecosystem, the Receiving Waters serve essential social functions, and serve as essential habitat for dozens of fish and bird species, as well as macro-invertebrate and invertebrate species. Storm water and non-storm water contaminated with sediment, heavy metals, and other pollutants harm the special aesthetic and recreational significance the Receiving Waters have for people in surrounding communities, including WATERKEEPER members. The public's use of the Receiving Waters for water contact sports and fishing exposes many people to toxic metals, pathogens, bacteria and other contaminants in storm water and non-storm water discharges.  Non-contact recreational and aesthetic opportunities, such as wildlife observation, are also impaired by polluted discharges to the Receiving Waters.

74.     Numeric WQS applicable to the Facility include, but may not be limited to, those detailed in TABLE 1.

**TABLE 1**
WATER QUALITY STANDARDS APPLICABLE TO THE FACILITY[2]

| PARAMETER | SOURCE | NUMERIC LIMIT |
|-----------|--------|---------------|
| pH | Basin Plan | 6.5-8.5 s.u. |
| Al | Basin Plan | 1.0 mg/L |
| Cu | CTR | 0.013 mg/L (CMC) |

---

[2] Several of the CTR limits are hardness dependent.  Defendant shall adjust the limit using the methods provided in Appendix J of the 2008 EPA Multi-Sector General Permit based on receiving water sampling hardness data as applicable.

COMPLAINT

| | | |
|---|---|---|
| Zn | CTR | 0.120 mg/L (CMC) |
| Pb | CTR | 0.065 mg/L (CMC) |
| Ni | CTR | 0.470 mg/L (CMC) |
| Cr | CTR | 0.016 mg/L (CMC) |
| Antimony | CTR | unknown |
| Arsenic | CTR | 0.34 mg/L (CMC) |

75.    Discharges of pollutants that violate applicable WQS contribute to the impairment of the beneficial uses of the waters receiving the discharges and constitute violations of the Permit and Act.

76.    Benchmarks and/or NALs established for conventional and industry specific pollutants discharged from the Facility, and for which GASSER must analyze stormwater samples, are summarized below at TABLE 2.

**TABLE 2**
BENCHMARK AND NAL VALUES APPLICABLE TO THE FACILITY[3]

| PARAMETER/ POLLUTANT | EPA BENCHMARK | ANNUAL NAL | INSTANTANEOUS MAXIMUM NAL |
|---|---|---|---|
| pH | 6.0-9.0 s.u. | n/a | 6.0-9.0 s.u. |
| TSS | 100 mg/L | 100 mg/L | 400 mg/L |
| O&G | 15 mg/L | 15 mg/L | 25 mg/L |
| TOC | 110 mg/L | 110 mg/L | n/a |
| COD | 120 mg/L | 120 mg/L | n/a |
| Al | 0.75 mg/L | 0.75 mg/L | n/a |
| Fe | 1.0 mg/L | 1.0 mg/L | n/a |
| Zn | 0.117 mg/L | 0.26 mg/L | n/a |

---

[3] Several of the 2008 EPA Benchmark based limits and CTR limits are hardness dependent. Defendant shall adjust the limit using the methods provided in Appendix J of the 2008 EPA Multi-Sector General Permit based on receiving water sampling hardness data as applicable.

COMPLAINT

18

| | | | |
|---|---|---|---|
| Ni | 1.02 mg/L | 1.02 mg/L | n/a |
| Mg | 0.064 mg/L | 0.064 mg/L | n/a |
| Cu | 0.0332 mg/L | 0.0332 mg/L | n/a |
| Pb | 0.0816 mg/L | 0.262 mg/L | n/a |

**D.    The Permit's Planning and BMP Design Requirements.**

77.    Permittees must develop and implement a Storm Water Pollution

Prevention Plan ("SWPPP") at the time industrial activities begin. 1997 Permit,

Sections A(1)(a) and E(2); 2015 Permit, Sections I(I) (Finding 54) and X(B).

78.    The SWPPP must include, *inter alia*: i) a narrative description and

summary of all industrial activity, potential sources of pollution, and pollutants

associated with each potential source; ii) a description of dust and particulate

generating activities; iii) a site map indicating the storm water conveyance system,

associated points of discharge, direction of flow, areas of actual and potential

pollutant contact, including the extent of pollution-generating activities, nearby water

bodies, and pollutant control measures; iv) a description of storm water management

practices; v) a description of the BMPs to be implemented to reduce or prevent

pollutants in storm water discharges and authorized non-storm water discharges; vi)

the identification and elimination of non-storm water discharges; vii) identify and

locate where materials are being shipped, received, stored, handled, as well as typical

quantities of such materials and the frequency with which they are handled; and viii) a

description of persons and their current responsibility for developing and

implementing the SWPPP. 1997 Permit, Section A(1)-(10); 2015 Permit, Section X.

79.    The 2015 Permit requires certain SWPPP enhancements, including a more comprehensive assessment of potential pollutant sources, and more specific descriptions of BMPs to be implemented.  *See* 2015 Permit Sections X(G)(2), (4), (5).

80.    The objectives of the SWPPP are to: i) identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges; and ii) to identify and describe site-specific BMPs to reduce or prevent the discharge of polluted storm water from industrial facilities.  1997 Permit, Section A(2); 2015 Permit, Section X.

81.    The SWPPP must evaluate sources of pollution associated with industrial activities ("Source Evaluation and Pollutant Assessment") and identify pollutants that may affect the quality of stormwater, and authorized non-stormwater discharges from each discharge point at the permittee facility ("Pollutant Assessment").  1997 Permit, Section A(2); 2015 Permit, Section X(G).

82.    The SWPPP must describe site-specific BMPs tailored to the facility based on the Source Evaluation and Pollutant Assessment. 1997 Permit, Section A(2); 2015 Permit, Section X(H).

83.    Permittees must then implement those BMPs so as to prevent or reduce pollutants associated with industrial activity in storm water and authorized non-stormwater discharges.

84.    Site-specific BMPs must achieve pollutant discharge reductions

attainable via BCT and BAT. 1997 Permit, Order Section A(2); 2015 Permit, Section I(D) (Finding 32), Section X(C).

85.    The SWPPP must be evaluated at least annually, and revised as necessary, to ensure ongoing compliance.  *See* 1997 Permit Sections A(9)-(10); *see also* 2015 Permit § X(B).

86.    Failures to develop, implement, and/or revise an adequate SWPPP constitutes independent Permit violations.  *See* 2015 Permit, Fact Sheet, Section I(1).

87.    The Permit requires that the discharger conduct an Annual Comprehensive Site Compliance Evaluation ("Compliance Evaluation") that includes a review of all visual observation records, inspection reports and sampling analysis data, a visual inspection of all potential pollutant sources for evidence of, or the potential for, pollutants entering the drainage system, a review and evaluation of all BMPs to determine whether the BMPs are adequate, properly implemented and/or maintained, or whether additional BMPs are needed, and a visual inspection of equipment needed to implement the SWPPP.  1997 Permit, Sections A(9)(a)-(c); 2015 Permit, Section XV.

88.    Section A(9)(d) of the 1997 Permit requires that the discharger submit a Compliance Evaluation each year that includes an identification of personnel performing the evaluation, date(s) of the evaluation(s) necessary SWPPP revisions, a schedule for implementing SWPPP revisions, any incidents of non-compliance and the corrective actions taken, and a certification that the discharger is in compliance

with the Permit.  1997 Permit; Section A(9)(d)(i)-(vi).  If certification cannot be provided, the discharger must explain in the Compliance Evaluation why the facility is not in compliance.  1997 Permit, Section A(9)(d).  The evaluation report shall be submitted as part of the Annual Report specified in Section B(14) of the Permit.  1997 Permit, Section A(9)(d).

**E.    The Permit's Monitoring and Reporting Requirements.**

89.    The 1997 Permit required facility operators to develop a monitoring and reporting program ("M&RP") along with its SWPPP, and then implement the M&RP as soon as industrial activities began. 1997 Permit, Sections B(1)-(2) and E(3).  The 2015 Permit contain virtually identical M&RP requirements.  2015 Permit, Sections X(I) and XI.

90.    The objectives of the M&RP are to ensure that BMPs have been adequately developed and implemented, and revised if necessary, and to ensure that storm water and non-storm water discharges are in compliance with the Permit (i.e. Discharge Prohibitions, Effluent Limitations, and/or Receiving Water Limitations). *See* 1997 Permit, Section B(2); *see also* 2015 Permit, Sections X(I) and XI.

91.    Dischargers must conduct monthly visual observations of storm water discharges as part of a legally adequate M&RP.  1997 Permit, Section B(4)(a); 2015 Permit, Section XI(A).

92.    Dischargers must visually observe and document the presence of any floating and suspended materials, oil and grease, discolorations, turbidity, or odor in a

discharge, and the source of any pollutants in storm water discharges from the facility. Dischargers are required to maintain detailed records of each observation, as well as for corrective action taken to reduce or prevent pollutants from contacting storm water discharges. *See* 1997 Permit, Section B(4)(c); *see also* 2015 Permit, Section XI(A)(3).

93.    The Permit requires dischargers to revise the SWPPP as necessary to ensure that BMPs are effectively reducing and/or eliminating pollutants from entering surface waters from a facility.  1997 Permit, Section B(4)(c), 2015 Permit, Section XI(B)(1).

94.    The Permit requires dischargers to visually observe and collect samples of storm water discharges from each location where storm water is discharged.  1997 Permit, Sections B(5) and B(7); 2015 Permit, Section XI(B)(4).

95.    Section B(5)(a) of the 1997 Permit required dischargers to collect storm water samples during the first hour of discharge from the first storm event of the Wet Season (defined as October 1 to March 30) and at least one other storm event in the Wet Season. All storm water discharge locations must be sampled. Facility operators that do not collect samples from the first storm event of the Wet Season are still required to collect samples from two other storm events of the Wet Season and must explain in the Annual Report why the first storm event was not sampled.

96.    Section B(5)(b) of the 1997 Permit required that sampling occur during scheduled facility operating hours that are preceded by at least three (3) working days

without storm water discharge.

97.    Section XI(B)(1) of the 2015 Permit requires sampling from a Qualifying Storm Event ("QSE"), which is a precipitation event that produces a discharge from at least one drainage area and is preceded by forty-eight (48) hours with no discharge from any drainage area.

98.    Dischargers are required to collect samples of storm water within 4 hours of the start of facility operations if the QSE began within the previous 12-hour period, e.g. for storms with discharges that begin during the night for facilities with day-time operations. 2015 Permit, Section XI(B)(5)(b).

99.    Section XI(B)(2) of the 2015 Permit requires dischargers to collect and analyze storm water samples from two (2) QSEs within the first half of each reporting year (July 1 to December 31), and two (2) QSEs within the second half of each Permit Term (January 1 to June 30).

100.    Section XI(B)(11) of the 2015 Permit, among other requirements, provides that permittees must submit all sampling and analytical results for all samples via SMARTS within thirty (30) days of obtaining all results for each sampling event.

101.    The Permit requires every discharger analyze each sample for certain Basic Parameters: pH, TSS and either total organic carbon ("TOC") or O&G.  1997 Permit, Section B(5)(c)(i); 2015 Permit, Sections XI(B)(6)(a)-(b).

102.    The Permit also requires dischargers to analyze each sample for site-

specific toxic chemicals and other pollutants associated with the industrial operations at the facility.  1997 Permit, Section B(5)(c)(ii); 2015 Permit, Section XI(B)(6)(c).

103.    The Permit requires every discharger analyze each sample for additional industrial parameters related to receiving waters with 303(d) listed impairments, or an approved TMDL. 1997 Permit, Section B(5)(c)(ii); 2015 Permit, Section XI(B)(6)(e).

104.    According to information and belief, WATERKEEPER alleges that the Permit requires GASSER to sample for parameters detailed above in TABLE 1 and TABLE 2.

105.    Section B(14) of the 1997 Permit required that dischargers submit an Annual Report to the applicable Regional Board by July 1 of each year. The Annual Report must include a summary of visual observations and sampling results, an evaluation of the visual observations and sampling and analysis results, laboratory reports, the annual comprehensive site compliance evaluation report specified in Section A(9), an explanation of why a facility did not implement any activities required, and the records specified in Section B(13)(i).

106.    Section XVI of the 2015 Permit requires dischargers to submit a Compliance Checklist with each Annual Report that: i) indicates whether the discharger complies with, and has addressed all applicable requirements of the 2015 Permit; ii) an explanation for any noncompliance of requirements within the reporting year, as indicated in the Compliance Checklist; and iii) an identification, including page numbers and/or sections, of all revisions made to the SWPPP within the

reporting year, the date(s) of the Annual Evaluation.  Most importantly, the Annual Report must outline those BMP revisions or additions, if any, that are necessary for the permittee to comply with the Permit and Act.

### F.    2015 Permit Exceedance Response Actions Requirements

107.   Section XII of the 2015 Permit establishes the procedures for Exceedance Response Actions, which are the activities that a permittee must completed when it has exceeded the annual and/or instantaneous NALs.

108.   A permittee enters Level 1 Status for a given parameter if sampling results indicate an NAL exceedance for that parameter.  2015 Permit, Section XII(C).

109.   Level 1 requirements include completing an evaluation by October 1 following commencement of Level 1 status and filing a Level 1 ERA Report by the next January 1.  2015 Permit, Section XII.C.1-2.

110.   The Level 1 ERA Report must include detailed descriptions of new and/or revised BMPs that the permittee proposes for bringing the facility into compliance with the Permit's Discharge Prohibitions, Effluent Limitations and Receiving Water Limitations.  *Id.*

## V.    STATEMENT OF FACTS

111.   Upon information and belief, GASSER first obtained Permit coverage on March 3, 1992 ("NOI 1992"); enrolled for coverage under the 1997 Permit on May 9, 1997 ("NOI 1997"); and then on May 5, 2015 obtained coverage under the 2015 Permit ("NOI 2015").  The Waste Discharge Identification ("WDID") number

originally assigned to the Facility, 4B19S, was replaced at least as early as 1997, and has been 4 19I000688 since.  The three SIC codes entered on each of the three NOIs are 3369 (Non-Ferrous Foundries, except Al and Cu), 3365 (Aluminum Foundries) and 3499 (Fabricated Metal Products, NEC).

112.   The Facility is approximately 38,115 sq. ft. of principally impervious surfaces.  Industrial activities, material storage, material handling and waste storage occur inside and outside the main production building.

113.   Storm water discharged from the Facility flows into a storm drain system operated by the County of Los Angeles that directs stormwater into Reach 2 of the Los Angeles River, which flows into Reach 1 of the Los Angeles River and ultimately reaches the Pacific Ocean via the Los Angeles River Estuary and San Pedro Bay (collectively, "Receiving Waters").

114.   Information available to WATERKEEPER indicates that the Receiving Waters are waters of the United States.

115.   Information available to WATERKEEPER indicates that the Facility has at least five discharge points, including from roof downspouts.

116.   On information and belief, Plaintiff alleges that the majority of storm water discharges from the Facility contain storm water that is commingled with runoff from areas at the Facility where industrial processes occur.

117.   According to information and belief, GASSER fabricates ferrous and non-ferrous castings for a variety of institutional, individual and corporate customers.

In order to accomplish these objectives, the Facility's industrial activities include, but may not be limited to: ferrous metal product fabrication, non-ferrous product fabrication; finishing operations including cutting, shaping, sanding, heat treatment, anodizing, painting, hardening and coating of both ferrous and non-ferrous products; storage of raw and waste materials including ferrous scrap, metal ingots, silica sand, abrasives, resin, chemical coatings, solvents and lubricants; loading and unloading transport vehicles with raw materials (including chemical components), finished products and waste materials; and storage and use of oil, fuel and chemicals necessary for machinery and vehicle operation and maintenance.  All industrial activities performed at the Facility are potential sources of water contamination.

118.   Various industrial operations performed at the Facility are vented to a bag house, which is located outside adjacent to one of the Facility's discharge points.

119.   On information and belief, Plaintiff alleges that the management practices at the Facility do not prevent the sources of contamination described above at paragraph 116 from causing the discharge of pollutants to waters of the United States.

120.   GASSER has taken and analyzed samples (or arranged for their collection/analysis) of storm water discharges at the Facility since at least 2000.

121.   GASSER has certified and submitted to the Regional Board at least some of these analytical results along with the Facility's annual reports.

122.   Table 3 (below) summarizes GASSER's results as submitted to the

Regional Board.

**TABLE 3**

WATER QUALITY STANDARDS APPLICABLE TO THE

| LINE | PERMIT TERM | NO. DISCHARGE POINTS DISCLOSED | DATE | PARAMETER | CONCENTRATION (mg/L) | DISCHARGE POINT DESCRIPTION |
|---|---|---|---|---|---|---|
| 1 | 1999-2000 | 1 | | | 0 samples collected | |
| 2 | 2000-2001* | 1 | 01.12.01 | Cu | 0.71 | "alleys" |
| 3 | | | | Zn | 1.4 | "alleys" |
| 4 | | | | SC | 570 | "alleys" |
| 5 | 2001-2002 | 2 | | | 0 samples collected | |
| 6 | 2002-2003 | 2 | 04.14.03 | N+N | 1.7 | Yard |
| 7 | | | | Cu | 0.6 | Yard |
| 8 | | | | Zn | 1.6 | Yard |
| 9 | | | | Cu | 0.2 | Alley |
| 10 | 2003-2004 | 2 | | | 0 samples collected | |
| 11 | 2004-2005* | 2 | 01.02.05 | Cu | 1.4 | Yard |
| 12 | | | | Cu | 0.098 | Alley |
| 13 | | | | Zn | 0.41 | Yard |
| 14 | | | | Zn | 0.36 | Alley |
| 15 | 2005-2006 | unknown | | no Annual Report available SMARTS or in hard-copy files | | |
| 16 | 2006-2007 | 1 | | | 0 samples collected | |
| 17 | 2007-2008* | 1 | 02.20.08 | Cu | 1.9 | roof drains/overflows |
| 18 | | | | Zn | 3.7 | roof drains/overflows |
| 19 | | | | N+N | 11 | roof drains/overflows |
| 20 | 2008-2009* | 1 | 02.07.09 | Cu | 0.55 | roof drains/overflows |
| 21 | | | | Zn | 2.5 | roof drains/overflows |
| 22 | 2009-2010* | 3 | 02.05.10 | Cu | 0.68 | "west reclaiming area" |
| 23 | | | 02.09.10 | Cu | 0.45 | "west reclaiming area" |
| 24 | 2010-2011 | 3 | 12.20.10 | Cu | 0.11 | unknown |
| 25 | | | | Zn | 0.36 | unknown |
| 26 | | | 03.17.11 | Cu | 0.09 | unknown |
| 27 | | | | Zn | 0.37 | unknown |
| 28 | 2011-2012 | 3** | 10.05.11 | Cu | 0.1 | SW Point |
| 29 | 2012-2013 | 3** | 12.07.12 | Cu | 0.08 | SW Point |
| 30 | | | | Zn | 0.28 | SW Point |
| 31 | 2014-2015 | 3** | 12.12.14 | Cu | 0.85 | "SW" |

| | | | | | | |
|---|---|---|---|---|---|---|
| 32 | | | | Zn | 0.48 | "SW" |
| 33 | 2015-2016* | 2 | 03.04.16 | Al | 0.82 | DP #1 |
| 34 | | | | Cu | 5.5 | DP #1 |
| 35 | | | | Pb | 0.39 | DP #1 |
| 36 | | | | Zn | 1.5 | DP #1 |
| 37 | | | | Fe | 1.5 | DP #1 |
| 38 | | | | TSS | 120 | DP #1 |
| 39 | | | | Cu | 1.5 | DP #2 |
| 40 | | | | Pb | 0.16 | DP #2 |
| 41 | | | | Zn | 0.6 | DP #2 |
| 42 | 2016-2017 | 2 | 12.30.16 | Cu | 0.1 | A |
| 43 | | | | Zn | 1.4 | A |
| 44 | | | | Cu | 0.12 | B |
| 45 | | | | Zn | 0.87 | B |
| 46 | | | 01.12.17 | Cu | 0.23 | SP #1 |
| 47 | | | | Zn | 0.61 | SP #1 |
| 48 | | | | Cu | 0.19 | SP #2 |
| 49 | | | | Zn | 1.3 | SP #2 |
| 50 | | | 01.20.017 | Cu | 0.12 | DP #1 |
| 51 | | | | Zn | 0.83 | DP #1 |
| 52 | | | | Zn | 0.21 | DP #2 |
| 53 | | | 02.06.17 | no exceedances of EPA Benchmarks | | |
| 54 | | | 02.17.17 | Cu | 0.85 | Side 1 |
| 55 | | | | Pb | 0.24 | Side 1 |
| 56 | | | | Zn | 1.8 | Side 1 |
| 57 | | | | Cu | 0.37 | Side 2 |

* - Reporting Years during which no samples were collected/analyzed between October to December.
** - Reporting Years during which Gasser reduced the number of sampling points.

123. Based on its assessment of the data summarized in Table 3, as well as its review of planning documents and reconnaissance visits conducted by staff and agents, WATERKEEPER alleges that GASSER has failed to carry out the public health and environmental protection mandates embodied in the Act and Permit.

124. On information and belief, WATERKEEPER specifically alleges that

COMPLAINT

30

GASSER has and continues to: A) discharge heavily polluted storm water and non-storm water in violation of the Permit's requirement to develop and implement BMPs that achieve BCT or BAT; B) discharge heavily polluted storm water and non-storm water in violation of the Permit's Receiving Water Limitations; C) operate without completing legally adequate planning procedures, namely to develop a legally adequate SWPPP; D) operate without developing, implementing and/or revising a legally adequate monitoring and reporting plan; and E) deliberately deceive the State Board, the Regional Board and the public regarding its effort to complete remedial actions required by the 2015 Permit.

125.    Plaintiff alleges that the storm water sampling data summarized in Table 3, and specifically the data establishing regular and substantial exceedances of EPA Benchmark concentrations, demonstrates that GASSER has failed to develop, implement or maintain BMPs that are compliance with the statutory BCT/BAT treatment standard.

126.    WATERKEEPER alleges that the data in Table 3 establish that GASSER has and likely continues to discharge storm water containing pollutant concentrations that adversely effect the environment and human health in violation of the Permit's Receiving Water Limitations.

127.    WATERKEEPER further alleges that the data in Table 3 establish that GASSER discharges storm water with pollutant concentrations that exceed applicable WQSs, which constitute violations of the Permit's Receiving Water Limitations.

128. On information and belief, WATERKEEPER alleges that GASSER has failed and continues to fail to undertake a comprehensive and honest approach to storm water pollution prevention planning, even after having entered Level 1 and Level 2 status for toxic pollutants like lead and copper.

129. GASSER has failed, and continues to fail, to prepare, implement, review and revise a legally adequate SWPPP.

130. GASSER's SWPPP generally fails to fulfill the essential policy purpose underpinning the planning requirement, and specifically fails numerous substantive provisions spelled out in the Permit.

131. The Site Map fails to include various features required by the Permit, including but limited to identifying all areas of industrial activity, identifying all points where stormwater is discharge from the Facility, and patently false information about the direction of flow at the Facility.

132. GASSER's SWPPP fails to include an adequate pollutant source assessment, specifically failing to adequately disclose, describe or assess the potential for point source and fugitive air emissions that are likely to contribute pollutants to storm water discharges.

133. GASSER's SWPPP fails to include full or complete descriptions of BMPs.

134. GASSER's SWPPP does not contain the level of detail required by the 2015 Permit's Sections X.H.4 and X.H.5.

COMPLAINT

135.   On information and belief, Plaintiff alleges that GASSER has failed to effectively implement BMPs described in (or included by reference) its SWPPP and other compliance documents, including but not limited to plans/reports developed as part of 2015 Permit's ERA remedial procedures.

136.   On information and belief, GASSER has failed to develop or implement an adequate monitoring and reporting program, most specifically a failure to collect storm water samples from each discharge point and to analyze collected samples for all pollutants required by the Permit.

137.   On information and belief, Plaintiff alleges that GASSER has intentionally bypassed critical BMPs designed for implementation as part of the 2015 Permit's ERA procedures in response to its past, acknowledged failure to meet Permit mandates.

138.   On information and belief, Plaintiff alleges that each Annual Report submitted by Defendant over at least the last five years has contained demonstrably false information, including by failing to identify and disclose all discharge points.

139.   On information and belief, Plaintiff alleges that GASSER has filed intentionally false and deliberately misleading reports to the State of California regarding its efforts to address toxic pollutant discharges at the Facility.

/ / /

/ / /

/ / /

COMPLAINT                                          33

## VI.  <u>CLAIMS FOR RELIEF</u>

**FIRST CAUSE OF ACTION**
**Defendant's Discharges of Contaminated Storm Water in**
**Violation of the Permit's Effluent Limitations and the Act**
**(33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f))**

140.    WATERKEEPER re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

141.    WATERKEEPER is informed and believes, and thereon alleges, that Defendants failed and continue to fail to reduce or prevent pollutants associated with industrial activities through the implementation of BMPs at the Facility that achieve BAT/BCT.

142.    WATERKEEPER is informed and believes, and thereon alleges, that discharges of storm water containing levels of pollutants that do not achieve compliance with BAT/BCT standards from the Facility occur every time storm water is discharged. Defendants' failure to develop and/or implement BMPs that achieve the pollutant discharge reductions attainable via BAT or BCT at the Facility is a violation of the Permit and the Act. *See* 1997 Permit, Effluent Limitation B(3); *see also* 2015 Permit, Section I(D) (Finding 32), Section V(A); *see also* 33 U.S.C. § 1311(b).

143.    Defendants violate and will continue to violate the Permit's Effluent Limitations each and every time storm water containing levels of pollutants that do not achieve BAT/BCT standards discharges from the Facility.

144.    Each and every violation of the Permit's Effluent limitations is a separate

and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).

145. Defendants' violations of the Permit's Effluent Limitations and the Act are ongoing and continuous.

146. By committing the acts and omissions alleged above, GASSER is subject to an assessment of civil penalties for each and every violation of the Act occurring from April 13, 2013 to the present, pursuant to sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

147. An action for injunctive relief is authorized by section 505(a) of the Act, 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm WATERKEEPER has no plain, speedy, or adequate remedy at law.

148. An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendants as set forth hereafter.

**SECOND CAUSE OF ACTION**
**Defendant's Discharges of Contaminated Storm Water in**
**Violation of the Permit's Receiving Water Limitations and the Act**
**(33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f))**

149. Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

150.    WATERKEEPER is informed and believes, and thereon alleges, that discharges of storm water containing levels of pollutants that adversely impact human health and/or the environment from the Facility occur each time storm water discharges from the Facility.

151.    WATERKEEPER is informed and believes, and thereon alleges, that storm water containing levels of pollutants that cause or contribute to exceedances of water quality standards has been discharged and continues to be discharged from the Facility each time stormwater is discharged from the Facility.

152.    Plaintiff is informed and believes, and thereupon alleges, that since at least April 13, 2013, Defendants have discharged polluted storm water from the Facility causing or contributing to the violation of the applicable WQS and that adversely impact human health or the environment in violation of the Receiving Water Limitation of the General Permit.

153.    Every day, since at least April 13, 2013, that Defendants have discharged polluted storm water from the Facility in violation of the Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  These violations are ongoing and continuous.

154.    Each and every violation of the Permit's Receiving Water Limitations is a separate and distinct violation of section 301(a) of the Act, 33 U.S.C. § 1311(a).

155.    By committing the acts and omissions alleged above, GASSER is subject to an assessment of civil penalties for each and every violation of the Act occurring

COMPLAINT

36

from April 13, 2013 to the present, pursuant to sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

156.   An action for injunctive relief is authorized by Act section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which WATERKEEPER has no plain, speedy, or adequate remedy at law.

157.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendants as set forth hereafter.

## THIRD CAUSE OF ACTION
**Defendant's Failure to Prepare, Implement, Review, and Update
an Adequate Storm Water Pollution Prevention Plan
(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

158.   Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

159.   Defendants have not developed and implemented an adequate SWPPP for the Facility.

160.   Each day since April 13, 2013, that Defendants did not develop, implement and update an adequate SWPPP for the Facility is a separate and distinct violation of the Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

COMPLAINT

161.   Defendants have been in violation of the SWPPP requirements every day since April 13, 2013.  Violations continue each day that an adequate SWPPP for the Facility is not developed and fully implemented.

162.   By committing the acts and omissions alleged above, GASSER is subject to an assessment of civil penalties for each and every violation of the Act occurring from April 13, 2013 to the present, pursuant to sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

163.   An action for injunctive relief is authorized by Act section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm WATERKEEPER has no plain, speedy, or adequate remedy at law.

164.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendants as set forth hereafter.

**FOURTH CAUSE OF ACTION**
**Defendant's Failure to Develop and Implement an**
**Adequate Monitoring and Reporting Program**
**(Violation of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

165.   Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

COMPLAINT

38

166.   Defendants have not developed and implemented an adequate monitoring and reporting program for the Facility.

167.   Each day since April 13, 2013, that Defendants have not developed and implemented an adequate monitoring and reporting program for the Facility in violation of the Permit is a separate and distinct violation of the Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).  The absence of requisite collection/ monitoring and analytical results is ongoing and continuous.

168.   By committing the acts and omissions alleged above, GASSER is subject to an assessment of civil penalties for each and every violation of the Act occurring from April 13, 2013 to the present, pursuant to sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

169.   An action for injunctive relief is authorized by Act section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm WATERKEEPER has no plain, speedy, or adequate remedy at law.

170.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendants as set forth hereafter.

COMPLAINT

**FIFTH CAUSE OF ACTION**
**Defendant's Failure to Accurately Certify Compliance**
**in Annual Reports in Violation of the Permit and the Act**
**(33 U.S.C. §§ 1311, 1342, 1365(a) and 1365(f))**

171.   Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

172.   Defendants have not accurately certified compliance with the Permit in each of the annual reports submitted to the Regional Board since at least April 13, 2013.

173.   Each day since at least April 13, 2013, that Defendants do not accurately certify compliance with the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).  Defendants continue to be in violation of the General Permit's certification requirement each day they maintain an inaccurate certification of compliance with the General Permit.

174.   By committing the acts and omissions alleged above, GASSER is subject to an assessment of civil penalties for each and every violation of the Act occurring from April 13, 2013 to the present, pursuant to sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

175.   An action for injunctive relief is authorized by Act section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm WATERKEEPER has no plain, speedy, or adequate remedy at law.

COMPLAINT

40

176.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendants as set forth hereafter.

## RELIEF REQUESTED

Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

a.   Declare Defendant(s) to have violated and to be in violation of the Act as alleged herein;

b.   Enjoin Defendant(s) from discharging polluted storm water from the Facility unless authorized by the Permit;

c.   Enjoin Defendant(s) from further violating the substantive and procedural requirements of the Permit;

d.   Order Defendant(s) to immediately implement storm water pollution control technologies and measures that are equivalent to BAT or BCT and prevent pollutants in the Facility's storm water from contributing to violations of any water quality standards;

e.   Order Defendant(s) to comply with the Permit's monitoring and reporting requirements, including ordering supplemental monitoring to compensate for past monitoring violations;

COMPLAINT

f.   Order Defendant(s) to prepare a SWPPP consistent with the Permit's requirements and implement procedures to regularly review and update the SWPPP;

g.   Order Defendant(s) to provide Plaintiff with reports documenting the quality and quantity of their discharges to waters of the United States and their efforts to comply with the Act and the Court's orders;

h.   Order Defendant(s) to pay civil penalties of up to $37,500 per day per violation for each violation of the Act since April 13, 2013, up to and including November 2, 2015, and up to $52,414 for violations occurring after November 2, 2015 pursuant to Sections 309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1 - 19.4;

i.   Order Defendant(s) to take appropriate actions to restore the quality of waters impaired or adversely affected by their activities;

j.   Award Plaintiff's costs (including reasonable investigative, attorney, witness, compliance oversight, and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and,

k.   Award any such other and further relief deemed appropriate by the Court.

DATED: June 22, 2018                    Respectfully submitted,

By:   /s/ Jesse C. Swanhuyser
Jesse C. Swanhuyser
**Attorney for Plaintiff**

COMPLAINT

42

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

COMPLAINT

1